# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **KIMBERLY WADE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:16-CV-1362-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Consent** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated August 23, 2016 (doc. 14), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Before the Court are *Plaintiff's Brief on Appeal*, filed September 21, 2016 (doc. 15) and *Defendant's Response Brief*, filed October 21, 2016 (doc. 16). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND[1]

### A. Procedural History

Kimberly Wade (Plaintiff) seeks judicial review of a final decision by the Acting Commissioner of Social Security (Commissioner)[2] denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act. (R. at 1-7.) On November 25, 2011, Plaintiff filed her application for DIB, alleging disability beginning August 20, 2010. (R. at 12.) Her claim was denied initially and upon reconsideration. (R. at 91-95, 97-100.) Plaintiff requested

---

[1] The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[2] At the time of filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

a hearing before an administrative law judge (ALJ), and she personally appeared and testified at a hearing on August 21, 2014.  (R. at 25-63.)  On December 10, 2014, the ALJ issued a decision finding that she was not disabled and denying her claim for benefits.  (R. at 9-24.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on December 12, 2014. (R. at 8.)  The Appeals Council denied her request for review on April 4, 2016, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-7.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

**B.**     **Factual History**

**1.**     **Age, Education, and Work Experience**

Plaintiff was born on January 13, 1961, and was 53 years old at the time of the hearing.  (R. at 18, 27.)  She had a high school education and could speak English fluently.  (R. at 18.)  She had past relevant work experience as a developer, telephone answering service operator, secretary, and pre-press operator.  (R. at 18-19.)

**2.**     **Medical Evidence**

From October 15, 2009, to October 26, 2011, Plaintiff received regular psychotherapy and medication management from Dr. Moses Ramos, M.D., for her depression and anxiety. (R. at 255-98.) Dr. Ramos diagnosed her with "agoraphobia with panic" and "major depressive disorder, recurrent, severe without psychosis." (R. at 255.) During these treatment sessions, Plaintiff routinely reported that family issues, particularly her relationship with her husband, had been a source of stress. (R. at 256, 264, 280, 296.) During the first few treatment sessions, Dr. Ramos noted how Plaintiff exhibited "low energy," anxiousness, irritability, and problems sustaining attention. (R. at 256, 260.) At the later sessions, Dr. Ramos noted how Plaintiff showed improvement in her

interactions with her family and peers, her conduct/behavior, her psychomotor activity, her speech/communication skills, her mood/affect, and her attention/concentration/cognition. (R. at 264, 268, 272, 276, 280, 284, 288, 292, 296.) During her treatment session on July 19, 2011, Dr. Ramos noted that Plaintiff had "regressed in social interaction" after her husband had a stroke. (R. at 272.) At the following treatment session, she explained that her husband could not return to work after his stroke and that she could not "stand" being with him for 24 hours. (R. at 276.) Dr. Ramos noted substantial improvements with Plaintiff's functioning during the next two treatment sessions and how she "actually does better when [her husband] is out of home." (R. at 288-90, 296.) During each visit, Dr. Ramos prescribed several anti-anxiety and anti-depressant medications and assigned her a Global Assessment of Functioning[3] (GAF) score that fluctuated between 55 and 85, with her final score being in the 65-75 range. (R. at 258-59, 261, 263, 266, 270, 274, 278, 282, 290, 294, 298.)

From February 23, 2011, to March 8, 2012, Plaintiff received treatment from Dr. William T. Hamlin, D.O., for her type II diabetes, hypertension, psoriasis, and hyperlipidemia. (R. at 301-07.) Her physical exams and "review of symptoms" were normal during each visit. (R. at 301, 303-04.) Dr. Hamlin prescribed her diabetic medication and advised her to lose weight, exercise, and closely monitor any pain in her feet. (R. at 304.)

On June 1, 2012, Plaintiff returned to Dr. Hamlin with complaints of abdominal pain, bloating, nausea, and burning sensations. (R. at 300.) He diagnosed her with gastritis; an ultrasound of her abdomen showed a fatty infiltration of the liver but an otherwise "sonographically unremarkable abdomen." (R. at 306-07.)

On September 27, 2012, and November 28, 2012, Plaintiff returned to Dr. Ramos for

---

[3] GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n.2 (5th Cir. 2001).

additional psychotherapy treatment and medication management. (R. at 333-40.) At both treatment sessions, Dr. Ramos noted improvements in Plaintiff's conduct/behavior, general appearance, psychomotor activity, speech/communication skills, mood/affect, attention/concentration/cognition, and judgment/impulse control. (R. at 334, 338.) He also noted that she had improved her relationship with her husband after she had set limits with him because she "loves [him] but does not want him around all the time." (R. at 334.) He prescribed three different anti-depressants and anti-anxiety medications and assessed her GAF score in the 65-75 range at both treatment sessions. (R. at 336, 340.)

On September 24, 2012, Norman Rittenberry, D.C., of Hampton Road Chiropractic, submitted an evaluation. (R. at 342.) Plaintiff had received treatment with him on March 22, 2006, February 13, 2007, and May 12, 2007. (R. at 342.) She was diagnosed with cervical segmental dysfunction, lumbar segmental dysfunction, and muscle spasms. (R. at 342.) She had received "conservative chiropractic care" that had "good results" with a decrease of pain, an increased range of motion, and decreased muscle spasms. (R. at 342.)

On October 17, 2012, Plaintiff met with Dr. Barbara S. Fletcher, Psy.D., for a consultative psychological mental examination. (R. at 345-48.) She drove herself to the appointment and demonstrated a normal posture and gait. (R. at 345.) She reported that her chief problems were depression and anxiety that began after she had been "drugging [her]self" with alcohol and received "a couple of DWIs." (R. at 345.) She also reported problems with anxiety and panic attacks that were caused by excessive stress, but "her overall level of anxiety [had] gone down" after she stopped working at her last job. (R. at 345-46.) Dr. Fletcher noted that Plaintiff's speech was "clear and easily understood," she had no unusual thought content, and had a "dysphoric mood" with an

anxious affect. (R. at 347-48.) She also noted that Plaintiff could count backwards from 20 to 1, could name the current and three previous presidents, and had an average intelligence and fund of knowledge. (R. at 347.) She diagnosed Plaintiff with major depressive disorder, recurrent, moderate severity; generalized anxiety disorder; and a provisional diagnosis of panic disorder without agoraphobia. (R. at 348.) Dr. Fletcher assigned her a GAF score of 51 and offered a guarded prognosis. (R. at 348.)

On October 26, 2012, Plaintiff met with Dr. Kelley Davis, D.O., for a consultative physical examination. (R. at 350-52.) He noted that Plaintiff had been diagnosed with diabetes, high cholesterol, high blood pressure, psoriasis, and chronic back/neck pain. (R. at 350.) He also noted that Plaintiff had experienced no adverse effects from her diabetes except that she had "numbness in her feet and legs at time." (R. at 350.) During the musculoskeletal exam, Dr. Davis rated Plaintiff's muscle and grip strength as "5/5" and did not identify any significant limitations in her range of motion. (R. at 352.) Plaintiff could partially squat but could not heel/toe walk. (R. at 352.) Dr. Davis noted that Plaintiff was "oriented to time, place, and self" and had no problem or confusion relating her medical history. (R. at 352.)

On November 13, 2012, Dr. Matthew Wong, Ph.D., a state agency medical consultant (SAMC), completed a mental residual functional capacity (RFC) assessment of Plaintiff based upon the medical evidence submitted. (R. at 355-58.) He opined that Plaintiff was no more than moderately limited in the areas of understanding, memory, sustained concentration, persistence, social interaction, and adaptation. (R. at 355-56.) He further opined that Plaintiff could understand, remember, and carry out detailed but not complex instructions; could make decisions on her own; could attend and concentrate for extended periods; could accept instructions; and could respond

appropriately to changes in a routine work setting. (R. at 357.)

Also on November 13, 2012, Dr. Wong completed a psychiatric review technique form based upon Plaintiff's medical records. (R. at 359-72.) He opined that Plaintiff had an affective disorder with a disturbance of mood with depressive symptoms and also had an anxiety-related disorder with recurrent panic attacks. (R. at 362, 364.) She had mild restrictions of activities of daily living and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. (R. at 369.) He ultimately concluded that Plaintiff was somewhat limited by psychologically based symptoms, but "the impact of these [symptoms did] not wholly compromise the ability to function independently, appropriately, and effectively on a sustained basis." (R. at 371.)

On November 14, 2012, Dr. Robin Rosenstock, M.D., a SAMC, completed a physical RFC assessment of Plaintiff based upon the medical evidence on record. (R. at 373-80.) Dr. Rosenstock opined that she had the following exertional limitations: could occasionally lift/carry 20 pounds; could frequently lift/carry 10 pounds; could stand/walk for a total of about 6 hours in an 8-hour workday; could sit for a total of about 6 hours in an 8-hour workday; and had an unlimited ability to push/pull. (R. at 374.) Dr. Rosenstock also opined that she had no postural, manipulative, visual, communicative, or environmental limitations. (R. at 375-77.)

On February 4, 2013, Dr. Jeanine Kwun, M.D., a SAMC, completed a reconsideration case assessment form on Plaintiff's medically determinable physical impairments. (R. at 383.) She affirmed Dr. Rosenstock's physical RFC assessment and agreed with the limitations it found, after reviewing all of the evidence in the record. (R. at 383.)

On February 6, 2013, Dr. Thomas Geary, Ph.D., a SAMC, completed a reconsideration case assessment form on Plaintiff's mental capabilities. (R. at 385-88.) He noted that she had "not

report[ed] mental worsening or any new/additional mental limitation" and that the medical reports did not indicate any worsening. (R. at 385.) He concurred with and affirmed Dr. Wong's mental RFC assessment and psychiatric review technique form. (R. at 385, 387.)

From January 29, 2013, to July 29, 2014, Plaintiff returned to Dr. Ramos for psychotherapy treatment and medication management. (R. at 391-432.) Her chief complaints continued to be about her husband and his refusal to give her "personal space" and "quiet time." (R. at 391-92, 395, 399, 403, 413, 417, 425.) At the final treatment session, Dr. Ramos noted that Plaintiff's mental issues worsened whenever her husband was home, and he even offered "to talk to [the husband] and [Plaintiff] together to discuss allowing her to have diversions alone/away from him without him getting mad." (R. at 416, 427.) As the treatment sessions progressed, Dr. Ramos opined that Plaintiff's mental limitations were improving and that she had normal speech habits, normal thought processes, normal attention and concentration, normal memory, normal judgment, and an adequate fund of knowledge. (R. at 392-93, 396-97, 400-01, 404-05, 414-15, 418-19, 422-23, 426-27, 430-31.) He also assigned her GAF scores that fluctuated between 51 to 70, but her score was most frequently in the 61-70 range. (R. at 393, 397, 401, 405, 415, 419, 423, 427, 431.)

On August 18, 2014, Dr. Ramos completed a Mental Impairment Questionnaire on behalf of Plaintiff. (R. at 435-42.) He noted that he had been meeting with her for several years and had diagnosed her with a severe major depressive disorder and agoraphobia with panic. (R. at 435.) He opined that she had a current GAF score in the 51-60 range and experienced symptoms of mood disturbance, social withdrawal, emotional lability, sleep disturbance, decreased energy, recurrent panic attacks, persistent irrational fears, generalized persistent anxiety, and difficulty thinking or concentrating. (R. at 435-36.) He noted that Plaintiff's response to treatment had been "up and down

due to stress from husband." (R. at 436.) Dr. Ramos completed a check-box questionnaire where he assessed Plaintiff's "mental abilities and aptitude needed to do unskilled work." (R. at 438-39.) He opined that Plaintiff had a fair ability to perform 4 of the identified mental abilities[4] and had no useful ability to perform the remaining 18 mental abilities.[5] (R. at 439.) He further opined that Plaintiff would be absent from work more than three times a month due to her impairments, and that she had "marked" restrictions of activities of daily life and social functioning, as well as a "constant" deficiency of concentration, persistence, or pace. (R. at 438, 441-42.)

### 3. Hearing Testimony

On August 21, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (R. at 25-63.) Plaintiff was represented by an attorney. (R. at 27.)

### a. Plaintiff's Testimony

Plaintiff testified that she was 53 years old, was 5'2" tall, and weighed approximately 235 pounds. (R. at 32.) She had not made any income since August 20, 2010, and was living off of her retired husband's pension. (R. at 34.) She was currently in her fourth marriage and had no children under the age of 18. (R. at 32-33.) Her husband regularly traveled to Wisconsin for "six and seven months at a time" to take care of his father, who suffered from congestive heart failure, during which

---

[4] Dr. Ramos opined that Plaintiff had a "fair" ability to understand, remember, and carry out very short and simple instructions; make simple work-related decisions; and ask simple questions. (R. at 438.)

[5] Dr. Ramos opined the Plaintiff had "poor or no ability" to: remember work-like procedures; maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; understand and remember detailed instructions; carry out detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; interact appropriately with the general public; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation. (R. at 439-41.)

time she would live by herself. (R. at 33, 45.) When her husband was out of town, she would leave the house "[a]bsolutely only if [she had] to," and she had received some help from her "friend that live[d] close by." (R. at 45-46.)

Plaintiff further testified that after high school, she had attended a community college where she accumulated "65 or 70" credit hours but did not receive an associate's degree from the school. (R. at 35-36.) In 1999, she had worked as a part-time film developer at Walgreens for over six months. (R. at 36.) At that same time, she had also worked at Great Impressions Printing and Graphics, where she completed the "pre-press" and "color stripping" for magazine photographs. (R. at 37.) In 2000, she had worked for over six months at an answering service called "Phone Fair A Texas," where she would take messages for the company's clients. (R. at 38.) From 2003 to 2007, she worked as the "night person" for a retirement apartment community. (R. at 39-40.) She stopped working there after she had experienced recurring panic attacks. (R. at 49.)

When questioned about her mental impairments, Plaintiff identified her depression, anxiety, and irritability as the main obstacles keeping her from being employed. (R. at 42.) She also had "situational stress" with her family, particularly with her husband being too intrusive, her son being "blown up" when he was deployed by the military to Iraq, and her step-daughter having a stillborn pregnancy. (R. at 42-43, 45.) Her depression affected her concentration and memory to where she could not "remember what [she was] doing half the time," and she also had problems with her short term memory. (R. at 44, 47.) Her depression caused her mood to be "down" when she experienced stress caused by "things [she could not] control." (R. at 51.) She explained how mental illness "runs in [her] family," but she had never been hospitalized for any psychiatric problems. (R. at 48, 53-54.) She had been prescribed four different anti-anxiety and anti-depressant medications by her

psychiatrist, but she still experienced regular panic attacks triggered by stress. (R. at 50, 52.)

### b. VE's Testimony

The VE testified that she had reviewed the vocational information in Plaintiff's file and determined that she had the following past relevant work experience: developer, DOT 976.685-014 (SVP: 2, light); telephone answering service operator, DOT 235.662-026 (SVP: 3, sedentary); receptionist, DOT 237.367-038 (SVP: 4, sedentary); and pre-press operator, DOT 651.582-010 (SVP: 5, medium). (R. at 55-56.)

The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work history as Plaintiff, and who also had the following restrictions: limited to light work; able to lift and carry 20 pounds occasionally and 10 pounds frequently; able to walk/stand for six to eight hours a day in blocks of two hours at a time with regular breaks; restricted to simple, routine, and repetitive instructions; must avoid "rapid assembly type work;" should not work with members of the general public; and limited to only incidental contact with coworkers. (R. at 57-58.) The VE testified that the hypothetical individual could perform jobs within the restricted range of light work occupational base which included the following: bakery worker, DOT 524.687-022 (SVP: 2, light) with 12,950 jobs nationally and 850 in Texas; routing clerk, DOT 222.687-022 (SVP: 2, light) with 27,200 jobs nationally and 1,250 in Texas; and cleaner, DOT 323.687-014 (SVP: 2, light) with 86,600 jobs nationally and 6,200 in Texas. (R. at 58.)

Plaintiff's attorney asked the VE to add the following limitations: able to maintain attention for only two hour segments; poor ability to sustain an ordinary routine without special supervision; poor ability to complete a normal work day without interruptions from psychologically based symptoms; poor ability to perform at a consistent pace without an unreasonable number and length

of rest periods; poor ability to accept instructions or respond to criticism; and a poor ability to respond appropriately to changes in a routine work setting. (R. at 59-60.) The VE responded that this hypothetical individual would not be able to maintain competitive employment. (R. at 60.)

## C. <u>The ALJ's Findings</u>

The ALJ issued her decision denying benefits on December 10, 2014. (R. at 9-24.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of August 20, 2010. (R. at 14.) At step two, the ALJ found that she had the following severe impairments: major depressive disorder, recurrent and severe without psychotic features; agoraphobia with panic; obesity; diabetic neuropathy; and psoriasis. (R. at 14.) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations. (R. at 14-15.)

Next, the ALJ determined that Plaintiff retained the RFC to perform the following: lift and carry 10 pounds frequently; lift and carry 20 pounds occasionally; stand/walk for 6 hours in an 8-hour workday in 2 hour intervals; sit for 2 hours in an 8-hour workday; able to remember, understand, and follow simple, routine, repetitive instructions; must avoid fast-paced production requirements; cannot work with the general public or as a part of a team of coworkers. (R. at 15-18.)

At step four, the ALJ determined that Plaintiff was unable to perform any of her past relevant work. (R. at 18.) At step five, the ALJ relied upon the VE's testimony to find her capable of performing work that existed in significant numbers in the national economy, including jobs such as bakery worker, routing clerk, and cleaner. (R. at 19.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from the alleged

onset date of August 20, 2010, through December 31, 2013.  (R. at 19.)

## II.  LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *Id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under

the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is

not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden

shifts to the Commissioner at step five to show that there is other gainful employment available in

the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This

burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations

or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304

(5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant

to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir.

2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review

is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. ISSUES FOR REVIEW

Plaintiff presents two issues for review:

[1] Not only did the Administrative Law Judge fail to properly analyze and weigh
the Plaintiff's treating psychiatrist's medical opinions, the Administrative Law Judge
placed no weight on the treating psychiatrist's opinions. [2] The Plaintiff could not
perform the jobs identified by the Administrative Law Judge as other work with the
found residual functional capacity. (doc. 15 at 4.)

### A.   <u>Treating Source Opinion</u>

Plaintiff first argues that the ALJ erred by failing to analyze Dr. Ramos's treating source

opinion in accordance with 20 C.F.R. § 404.1527. (doc. 15 at 9-12.)

The Commissioner is entrusted to make determinations regarding disability, including

weighing inconsistent evidence. 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated

regardless of its source, but the Commissioner generally gives greater weight to opinions from a

treating source. *Id.* at § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist,

or other acceptable medical source" who provides or has provided a claimant with medical treatment

or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* at §
404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a
claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner
must give such an opinion controlling weight. *Id.* at § 404.1527(c)(2). If controlling weight is not
given to a treating source's opinion, the Commissioner considers six factors in deciding the weight
given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the
source treated the claimant; (3) the medical signs and laboratory findings that support the given
opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is
made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or
contradict the opinion." *See id.* at § 404.1527(c)(1)–(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating
physicians when determining disability, sole responsibility for this determination rests with the ALJ.
*Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician
may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good
cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by
medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by
the evidence." *Id.* at 455–56. Nevertheless, "absent reliable medical evidence from a treating or
examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion
of the treating physician only if the ALJ performs a detailed analysis of the treating physician's
views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed
analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ

finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, the ALJ identified Dr. Ramos as Plaintiff's "treating psychiatrist" who examined her, diagnosed her with depression and anxiety, and provided progress notes and medical records on her mental impairments beginning October 2009. (R. at 16-17.) She reviewed a questionnaire on Plaintiff's mental limitations that he completed on August 18, 2014, in which he "opin[ed] that secondary to anxiety and depression [Plaintiff had] marked to extreme work-related limitations in all areas of function" with a "current GAF of 51 to 60 and a past year GAF of 65." (R. at 17.) The ALJ cited to Dr. Ramos's progress notes from Plaintiff's treatment sessions and noted an inconsistency between his opinions on the 2014 questionnaire and his most recent progress notes. The notes stated that Plaintiff had "demonstrated intact function even when she [had] presented asserting elevated levels of anxiety/irritability" and had also been "assessed with a GAF of 65 to 70 as recently as May 2014 [where she] had a GAF in this range for more than one year [before] it lowered to a 60 to 51 in July 2014, when she report[ed] increased stress after her husband returned home from an extended stay in Wisconsin." (R. at 17.)  The ALJ found that the "[p]rogress notes . . . do not establish symptoms that would preclude her from remembering, understanding, and following simple, routine, repetitive instructions" because they "show [Plaintiff had] regularly exhibited intact memory and concentration," and that her "increased symptoms [had] typically occurred only secondary to familial stress." (R. at 17-18.) The ALJ explained that the medical evidence, particularly Dr. Ramos's treatment notes, "establish[ed] the moderate limitations in

function proposed by the Disability Determination Services" and not the extreme limitations assessed by Dr. Ramos in his 2014 questionnaire. (R. at 17-18.) The ALJ then assigned Plaintiff a mental RFC where she could "remember, understand, and follow simple, routine, repetitive instructions" but must avoid the stress triggers of "fast-paced production requirements" and working "with the general public or as part of a team with coworkers." (R. at 16.)

Though Plaintiff claims that the decision was "void of any analysis or weight placed on [Dr. Ramos's] opinions," it properly evaluated Dr. Ramos's medical opinions as required under § 404.1527. In her decision, the ALJ first identified the proper standard for evaluating medical opinions and stated how she "considered opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527." (R. at 16.) She then specifically stated that Dr. Ramos was Plaintiff's "treating psychiatrist," noted the history of examinations and treatment since October 2009, and referenced multiple pieces of medical evidence identifying Dr. Ramos as a psychiatrist specialist. (R. at 16-17.) When evaluating his opinions on Plaintiff's "extreme" mental limitations made in the 2014 questionnaire, she noted the inconsistency between his opined limitations and his progress notes and explained that his own progress notes did not support them, but instead supported the "moderate limitations" that she incorporated into Plaintiff's RFC. (R. at 16-17.) Plaintiff does not identify any additional factor that the ALJ failed to consider in her evaluation. (*See* doc. 15 at 9-12.)

Accordingly, the ALJ properly considered the medical opinions of Dr. Ramos and went through the factors necessary in analyzing them, and substantial evidence supports the ALJ's decision. *See Newton*, 209 F.3d at 458; *see also Zapata v. Colvin*, No. 4:13-CV-340-Y, 2014 WL 4354243, at *9 (N.D. Tex. Sept. 2, 2014). To the extent that Plaintiff complains of the failure to weigh Dr. Ramos's medical opinions or include them in Plaintiff's RFC, the ALJ did not err, and

remand is not required on this issue.

**B.**     **Step Five**

Plaintiff also argues that the ALJ erred at step five because Plaintiff "could not perform the jobs identified by the VE with the ALJ's found RFC." (doc. 15 at 12-15.)

    **1.**     *VE's Testimony*

To be considered disabled, a claimant must have a severe impairment that makes her unable to perform her previous work or any other substantial gainful activity existing in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a).  According to the Code of Federal Regulations, "[w]ork exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements [that a claimant is] able to meet with [her] physical or mental abilities and vocational qualifications."  20 C.F.R. § 404.1566(b).  It is the Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy.  20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this finding.  *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga*, 810 F.2d at 1302).

The Commissioner may consult several different sources of evidence, including vocational experts and the Dictionary of Occupational Titles (DOT),[6] to determine when presumptively-disabled claimants can perform alternative and available work. *See Veal v. Soc. Sec.*

---

[6]     The DOT and its supplement, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs. The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy." Soc. Sec. R. 00–4p, 2000 WL 1898704, at *2.

*Admin.*, 618 F. Supp. 2d 600, 608 (E.D. Tex. 2009). Vocational experts assess whether jobs exist

for a person with the claimant's precise abilities and help to determine complex issues, such as

whether a claimant's work skills can be used in other work, and the specific occupations in which

they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). The ALJ may further rely on the

testimony of a VE in response to a hypothetical question[7] or other similar evidence. *Newton*, 209

F.3d at 458; *Bowling*, 36 F.3d at 435. Social Security Ruling 00–4p requires that prior to relying

upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain

a reasonable explanation for any apparent conflicts between occupational evidence provided by a

VE and information in the DOT. *See* SSR 00-4p, 2000 WL 1898704, at *1-2 (Dec. 4, 2000). As part

of her duty to fully develop the record, the ALJ has an "affirmative responsibility" to inquire of the

VE on the record whether or not there is such an inconsistency. *Graves v. Colvin*, 837 F.3d 589, 592

(5th Cir. 2016) (citations omitted).

Here, the ALJ determined that Plaintiff had an RFC for a limited range of light work and,

relying exclusively on the testimony from the VE, found at step five that Plaintiff was "capable of

making a successful adjustment to other work that existed in significant numbers in the national

economy," including jobs like bakery worker, routing clerk, and cleaner. (R. at 15-16, 19.) The ALJ,

however, failed to inquire on the record at the administrative hearing as to whether the VE's

---

[7]  "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)). A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

testimony was consistent or conflicted with the DOT.[8] (*See* R. at 54-60.) This was error. *See Graves,* 837 F.3d at 592 (holding that it is error when "the ALJ [does] not ask whether [the VE's] testimony was consistent with the DOT" even if "the vocational expert cite[s] the DOT in her testimony").

### 2. *Harmless Error*

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp. 2d 811 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). Accordingly, to establish prejudice that warrants remand, Plaintiff must show that the VE's testimony was "actually inconsistent with the DOT" and could have resulted in a different decision. *See Graves*, 837 F.3d at 593 (applying a harmless-error standard when the ALJ erred by failing to ask the VE if her testimony was consistent with the DOT.)

Plaintiff argues that the VE's testimony on how Plaintiff could perform the jobs of bakery worker, routing clerk, and cleaner with her assigned RFC conflicted with each of the DOT's description of these jobs. (doc. 15 at 12-15.) She contends that she is unable to work as a bakery worker or routing clerk because they both require "fast-paced" production, and she is unable to work

---

[8] In her written decision, the ALJ concluded that "the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." (R. at 19.) This finding is insufficient because "[t]here is no provision in SSR 00–4p for the ALJ to determine on his own if there is a discrepancy between the VE's testimony and the DOT; the ALJ must elicit the information from the VE on the record." *Jones v. Colvin*, No. 3:11-CV-2818-BH, 2013 WL 1285486, at *21 (N.D. Tex. Mar. 29, 2013) (citing SSR 00–4p, 2000 WL 1898704, at *2).

as a cleaner because it requires contact with the general public. (*Id*. at 14, 16-17.)

During the administrative hearing, the ALJ questioned the VE about a hypothetical individual who had several limitations, including that she must be restricted to "fairly simple routine and repetitive instructions," must "avoid rapid assembly type work where . . . there would be extra possibility for error in there for stress," and "should not work with members of the general public or as part of a team of coworkers in order to accomplish the task." (R. at 57-58.) In response, the VE testified that, despite these limitations, this hypothetical individual could perform the job requirements necessary for a bakery worker, a routing clerk, and a cleaner. (R. at 58.) In her decision, the ALJ incorporated those limitations into Plaintiff's RFC by finding that she "can remember, understand, and follow simple, routine, [and] repetitive instructions" but she "must avoid fast-paced production requirements" and "cannot work with the general public or as part of a team with coworkers." (R. at 16.) The ALJ relied upon the VE's testimony at step five to find that Plaintiff was not disabled and could perform all requirements necessary for the jobs of bakery worker, routing clerk, and cleaner. (R. at 19.)

Here, Plaintiff points solely to the descriptions in the DOT of bakery worker,[9] routing clerk,[10]

---

[9]  The job requirements of a "bakery worker" are identified in the DOT as: "Performs any combination of following tasks in preparation of cakes along conveyor line: Reads production schedule or receives instructions regarding bakery products that require filling and icing. Inspects cakes moving along conveyor to detect defects and removes defective cakes from conveyor to reject bins. Positions cakes on conveyor for application of filling or icing by machine, observes filling or icing application to ensure uniform coverage, and places additional cake layers on coated layers, depending on number of cake layers in product. Observes cakes moving under automatic topping shaker and cake cutting machine to ensure uniform topping application and cutting. Smooths iced edges of cake, using spatula, and moves decorating tool over top of designated cakes to apply specified appearance. Notifies supervisor of malfunctions." *See* Dictionary of Occupational Titles, § 524.687-022 (4th ed.1991).

[10]  The job requirements of a "routing clerk" are identified in the DOT as: "Sorts bundles, boxes, or lots of articles for delivery: Reads delivery or route numbers marked on articles or delivery slips, or determines locations of addresses indicated on delivery slips, using charts. Places or stacks articles in bins designated according to route, driver, or type. May be designated according to work station as Conveyor Belt Package Sorter (retail trade). May sort sacks of mail and be known as Mail Sorter (r.r. trans.)." *See* DOT, § 222.687-022.

and cleaner[11] as evidence of the inconsistency between the VE's testimony and the DOT. (doc. 15 at 12-14.) She argues that the bakery worker and routing clerk positions are production jobs because the DOT describes them both as utilizing a conveyor line/belt with a production schedule, and she further argues that the cleaner position requires work with the general public because the DOT describes it as "render[ing] personal assistance to patrons." (*Id.*) Plaintiff, however, fails to identify any evidence showing that the production rates for bakery workers/routing clerks are fast-paced[12] or that a cleaner actually works directly with the general public when providing "personal assistance." None of the identified job descriptions in the DOT directly conflict with the VE's testimony based upon Plaintiff's assigned RFC. *See Perez*, 415 F.3d at 464 ("where the claimant offers no evidence contrary to the VE's testimony, the claimant fails to meet his burden of proof under the fifth step of the disability analysis"); *see also Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012) ("The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error . . . [a] mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden.").

Plaintiff has failed to show an inconsistency between the VE's testimony and the DOT and, accordingly, has failed to show that she experienced any prejudice from the ALJ's failure to comply

---

[11] The job requirements of a "cleaner" are identified in the DOT as: "Cleans rooms and halls in commercial establishments, such as hotels, restaurants, clubs, beauty parlors, and dormitories, performing any combination of following duties: Sorts, counts, folds, marks, or carries linens. Makes beds. Replenishes supplies, such as drinking glasses and writing supplies. Checks wraps and renders personal assistance to patrons. Moves furniture, hangs drapes, and rolls carpets." *See* DOT, § 323.687-014.

[12] Plaintiff does state in her motion that "[i]f the quarrel is over whether the job is fast-paced or not, then the ALJ's findings of fact violated Social Security Ruling 00-04p as ALJs have an affirmative duty to ask VEs whether their testimony conflicts with information contained within the DOT." (doc. 15 at 13-14.) She does not explain or provide any authority on how an ALJ's error under SSR 00-04p leads to an automatic finding of inconsistency between the VE's testimony and the DOT. *See Graves*, 837 F.3d at 592-93 (explaining how the burden is on the claimant to show an inconsistency).

with SSR 00–4p.[13]  The ALJ's error was harmless and does not warrant remand.

## IV. CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 21st day of September, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[13]  Even assuming the existence of a conflict between the DOT and the VE's testimony, such a conflict would not be direct or obvious and would instead be an implied or indirect conflict. *See Zapata*, 2014 WL 4354243, at *11 (noting the difference between direct and implied conflicts with a VE's testimony). Plaintiff did not identify any conflict at the administrative hearing, and "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Id.* (citing *Carey*, 230 F.3d at 142).